IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| James Leroy Rife, | ) | C/A No.: 1:20-cv-1685-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable J. Michelle Childs, United States District Judge, dated October 23, 2020, referring this matter for disposition. [ECF No. 17]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 10].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial

evidence and whether he applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

A.    Procedural History

On March 2, 2017, Plaintiff protectively filed an application for DIB in which he alleged his disability began on October 21, 2016. Tr. at 72, 194–95. His application was denied initially and upon reconsideration. Tr. at 116–19, 121–26. On December 11, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Richard LaFata. Tr. at 1–58 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 15, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 88–105. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 106–11. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 29, 2020. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 50 years old at the time of the hearing. Tr. at 9. He completed high school and one year of college, obtaining a commercial driver's license ("CDL"). Tr. at 9–10. His past relevant work ("PRW") was as an over-the-road truck driver and a combination dispatcher and tractor trailer driver.

Tr. at 45. He alleges he has been unable to work since October 21, 2016. Tr. at 194.

### 2. Medical History

On October 18, 2016, Plaintiff presented to neurosurgeon Thomas S. Anderson, M.D. ("Dr. Anderson"), at Southeastern Spine Institute. Tr. at 327. He complained of back and leg pain that had been ongoing for two-and-a-half to three months. *Id.* He reported his pain was exacerbated by prolonged sitting and moving heavy objects. *Id.* He described achiness and stiffness in his lower back that was worse in the mornings and sharp, stabbing, burning pain that radiated from his lower back to his buttock and right hamstring. *Id.* He noted 75% of his pain was in his back and 25% was in his legs. *Id.* He identified aggravating factors to include sitting, standing, rising from a seated position, leaning forward, walking, lying on his side, coughing, sneezing, and bending forward. *Id.* He noted frequent changes of position were helpful. *Id.* He rated his pain as a nine out of 10 on the pain scale. *Id.* Dr. Anderson noted 5/5 strength on manual muscle testing, normal muscular bulk and tone, no abnormal muscle movements, non-antalgic gait and station, normal reflexes, intact cranial nerves, no Hoffman sign, no clonus, and intact coordination and sensory exam. Tr. at 328. He ordered and reviewed x-rays of Plaintiff's lumbosacral spine that showed multilevel degenerative spondylosis most pronounced at L5–S1. *Id.* He assessed low

3

back pain and other spondylosis of the lumbar region and ordered magnetic resonance imaging ("MRI") of the lumbar spine. *Id.* He prescribed Valium 5 mg and Demerol 50 mg. *Id.* He encouraged exercise and provided Plaintiff information on smoking cessation. *Id.*

On October 20, 2016, an MRI of Plaintiff's lumbar spine showed a left herniation with probable left L5 nerve root compression at L4–5 and a herniation with bilateral S1 root contact and potential compression at L5–S1. Tr. at 332.

Plaintiff followed up with Dr. Anderson to review his MRI scan on October 24, 2016. Tr. at 326. Dr. Anderson explained that Plaintiff had two degenerated discs at L4–5 and L5–S1, a small to moderate-sized left paracentral herniation at L4–5 with deflection of his L5 root on the left, and a central small herniation at L5–S1 between the nerve roots. *Id.* He noted 5/5 strength on manual muscle testing, normal muscle tone and bulk, no abnormal muscle movements, and normal gait and station. *Id.* He assessed low back pain, other spondylosis of the lumbar region, lumbar radiculopathy, and other intervertebral disc displacement of the lumbar region. *Id.* He noted Plaintiff should remain out of work for six weeks, rest, and avoid heavy or repetitive lifting, bending, and twisting. *Id.* He also ordered an epidural steroid injection ("ESI") that G. Robert Richardson, M.D., administered at Plaintiff's L4–5 level. Tr. at 326, 331.

On November 14, 2016, Plaintiff reported approximately 50% relief from the ESI at L4–5. Tr. at 325. He rated his pain as a four. *Id.* Dr. Anderson noted 5/5 strength in all muscle groups tested, normal muscle tone and bulk, no abnormal muscle movements, and normal gait and station. *Id.* He did not think he could manage Plaintiff's problem effectively with intermittent ESIs. *Id.* He recommended Plaintiff hold off on another ESI until his pain levels were unbearable. *Id.* He also recommended Plaintiff use a lumbar support arthrosis. *Id.*

Plaintiff presented to hepatology and gastroenterology specialist Ira R. Willner, M.D. ("Dr. Willner"), for annual follow up as to fatty liver disease on November 22, 2016. Tr. at 307. He endorsed no liver-related complaints, but reported a back injury that had limited his activity over the prior six weeks. *Id.* Lab work showed normal liver function tests and F2 fibrosis. *Id.* Dr. Willner noted Plaintiff had gained about 20 pounds over the prior year and explained to him that he needed to increase his activity and overall health to minimize progression of liver disease. *Id.*

On November 28, 2016, Plaintiff presented to Frampton Henderson, M.D. ("Dr. Henderson"), for follow up of multiple conditions, including diabetes mellitus, anxiety/depression, hypertension, and hyperlipidemia. Tr. at 342. Dr. Henderson recorded normal findings on physical exam. Tr. at 343–44. He assessed type 2 diabetes without complication, depression,

essential hypertension, hyperlipidemia, and low back pain. Tr. at 344. He prescribed Norco 7.5-325 mg for low back pain and refilled Invokana 300 mg and Metformin HCl ER 500 mg for diabetes, Celexa 20 mg for depression, Lisinopril 10 mg for hypertension, Lipitor 40 mg for hyperlipidemia, and Valium 2 mg. *Id.* He ordered a hemoglobin A1c test, a complete blood count, and a comprehensive metabolic panel. *Id.*

On December 23, 2016, Leonard E. Forrest, M.D., administered an ESI at Plaintiff's L4–5 level. Tr. at 330.

Plaintiff returned to Dr. Anderson on January 10, 2017, and reported no relief from his most recent ESI. Tr. at 324. He described lower back and intermittent left leg pain. *Id.* Dr. Anderson observed 5/5 strength in all muscle groups tested, normal muscular bulk and tone, no abnormal muscle movements, and normal gait and station. *Id.* He noted Plaintiff had significant disc disease at L4–5 and L5–S1, but was hesitant to consider spinal fusion at the time. *Id.* He recommended Plaintiff concentrate on weight loss, physical therapy, and injections to try to avoid surgery. *Id.* He indicated Plaintiff was unable to return to work at the time and might need long-term disability to recover. *Id.* He ordered a lumbar ESI, which German Levin, M.D., administered. Tr. at 324, 329.

Plaintiff presented to Premier Physical Therapy for an initial assessment on January 16, 2017. Tr. at 364. Patrick Colpitt, PT, DPT ("PT

Colpitt"), observed Plaintiff to present with an antalgic gait and to demonstrate decreased range of motion ("ROM") of the lumbar spine and lower extremity strength on testing. *Id.* He recommended Plaintiff participate in physical therapy two-to-three times a week for six weeks. *Id.*

On February 17, 2017, Plaintiff reported a transcutaneous epidural nerve stimulation ("TENS") unit did not help his pain and ESIs had provided minimal relief. Tr. at 368. He endorsed sleep disturbance and pain with bending, lifting, and sitting, standing, and walking for extended periods. *Id.* PT Colpitt indicated Plaintiff continued to report low back pain with certain activities, but decreased left lower extremity pain. Tr. at 366. He noted Plaintiff had attended ten physical therapy sessions and had increased the ROM of his lumbar spine and his lower extremity strength since starting therapy. *Id.*

Plaintiff followed up with Kimsey Cooper, PA-C ("PA Cooper"), in Dr. Anderson's office on February 21, 2017. Tr. at 323. He reported resolution of his lower extremity pain with continued axial back pain. *Id.* He endorsed difficulty upon bending, twisting, lifting, and prolonged sitting. *Id.* PA Cooper reviewed Plaintiff's MRI report, noting moderate bilateral facet arthropathy at L4–5 and L5–S1 with disc degeneration and spondylosis at those levels. *Id.* She observed Plaintiff to have 5/5 strength in all muscle groups tested, normal muscular bulk and tone, no abnormal muscle movements, and normal

gait and station. *Id.* She recommended facet injections and medial branch blocks ("MBB")/rhizotomy. *Id.* She encouraged Plaintiff to lose weight and stop smoking. *Id.* She did not schedule Plaintiff for MBB, but indicated he was to call the office back to schedule. *Id.*

On March 31, 2017, Plaintiff denied depressive symptoms and diabetes-related complications, but complained of worsening anxiety and panic attacks. Tr. at 337. He weighed 270 pounds. Tr. at 338. His glucose was high at 146 mg/dL and his hemoglobin A1c was elevated at 9.5%. Tr. at 339. Dr. Henderson assessed diabetes with diabetic kidney complications, proteinuria, major depressive disorder ("MDD") in partial remission, essential hypertension, hyperlipidemia, low back pain, panic disorder, and balanitis. Tr. at 340. He stopped Invokana, started Farxiga, and refilled Oxyglyza for diabetes. *Id.* He increased Plaintiff's dose of Celexa for MDD from 20 to 40 mg. *Id.* He continued Lisinopril for hypertension and Lipitor for hyperlipidemia, refilled Norco for back pain and Valium for panic disorder, and prescribed Fluconazole for balanitis. Tr. at 340–41.

Dr. Henderson completed a mental capacity assessment on March 31, 2017. Tr. at 354–56. He noted Plaintiff had slight limitations as to his abilities to: understand and remember detailed instructions; carry out very short and simple instructions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors;

maintain socially-appropriate behavior and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions. *Id.* He indicated Plaintiff had moderate limitation as to abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. *Id.* He noted Plaintiff had marked limitation in his abilities to perform at a consistent pace with a standard number and length of rest periods and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Tr. at 354, 355. He stated Plaintiff had marked-to-severe anxiety. Tr. at 356. He denied that alcohol or substances affected Plaintiff's functional abilities. *Id.* He considered Plaintiff capable of managing benefits in his own best interest. *Id.*

State agency medical consultant Jean Smolka, M.D. ("Dr. Smolka"), reviewed the record on June 12, 2017, and assessed Plaintiff's physical

residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balance, crouch, and climb ramps/stairs; occasionally stoop, kneel, and crawl; never climb ladders/ropes/scaffolds; frequently lift overhead with the bilateral upper extremities; and avoid concentrated exposure to extreme heat and hazards. Tr. at 66–69.

On June 14, 2017, state agency psychological consultant Jennifer Steadham, Ph.D. ("Dr. Steadham"), reviewed the record and considered Listing 12.04 for depressive, bipolar, and related disorders. Tr. at 64–65. She assessed Plaintiff as having mild difficulties in interacting with others and concentrating, persisting, or maintaining pace and no difficulties as to adapting or managing oneself and understanding, remembering, or applying information. *Id.* A second state agency psychological consultant, Annette Brooks-Warren, M.D. ("Dr. Brooks-Warren"), affirmed Dr. Steadham's opinion on September 6, 2017. Tr. at 79–80.

On June 30, 2017, Plaintiff reported poor, but improving, response to diabetes therapy. Tr. at 487. He endorsed worsened anxiety and panic attacks. *Id.* Recent lab studies showed elevated glucose at 295 mg/dL and hemoglobin A1c at 9.4%. Tr. at 490. Dr. Henderson observed decreased ROM

10

in Plaintiff's lower back. Tr. at 491. He indicated Plaintiff did not want to add medication for diabetes management and indicated he would work on diet and weight loss instead. Tr. at 492. Dr. Henderson said he would need to modify Plaintiff's medication regimen if he failed to show improvement at his next visit. *Id.* He prescribed Trazodone for insomnia, refilled Lipitor, and continued Plaintiff's other medications. Tr. at 491–92.

On July 18, 2017, Plaintiff presented to John M. Ferguson, M.D. ("Dr. Ferguson"), with a seven-day history of worsening right upper quadrant pain. Tr. at 485. He described the pain as like that he experienced when diagnosed with pancreatitis in 2015. *Id.* Dr. Ferguson noted normal findings on exam. Tr. at 485. He ordered a computed tomography ("CT") scan of Plaintiff's abdomen and pelvis that showed a possible duodenal mass. Tr. at 482, 483. He subsequently ordered an upper gastrointestinal series and referred Plaintiff to Dr. Willner for further evaluation. Tr. at 483.

Plaintiff followed up for routine management of diabetes, anxiety/depression, hypertension, hyperlipidemia, pain management, and insomnia on September 29, 2017. Tr. at 472–73. Recent lab studies showed elevated hemoglobin A1c at 9.4%. Tr. at 474. Dr. Henderson noted a scaling rash to Plaintiff's left groin and decreased ROM in his lower back. Tr. at 477. He refilled Farxiga and Metformin, stopped Onglyza, and started Trulicity for diabetes management. Tr. at 477. He stopped Celexa and prescribed

Cymbalta for MDD and refilled Valium for panic disorder, Lisinopril for hypertension, Lipitor for hyperlipidemia, Norco for chronic pain, and Trazodone for sleep. Tr. at 478.

On October 16, 2017, a second state agency medical consultant, James M. Lewis, M.D. ("Dr. Lewis"), reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally stoop, kneel, crawl, and climb ramps/stairs; frequently crouch and balance; and never climb ladders/ropes/scaffolds. Tr. at 81–83.

Plaintiff followed up with Dr. Henderson for anxiety/depression, diabetes, hypertension, hyperlipidemia, pain management, and insomnia on January 2, 2018. Tr. at 463–64. He reported Actos caused a film on his tongue and he could not tolerate it. Tr. at 463. Recent lab tests showed Plaintiff's glucose and hemoglobin A1c to be elevated at 329 mg/dL and 9.6%, respectively. Tr. at 464–68. Dr. Henderson recorded normal findings on exam, aside from decreased ROM in Plaintiff's lower back. Tr. at 468–69. He assessed MDD in partial remission, panic disorders, type 2 diabetes with diabetic neuropathy and other diabetic kidney complications, polyneuropathy associated with underlying disease, unspecific proteinuria, essential hypertension, hyperlipidemia, low back pain, other chronic pain, insomnia

12

due to medical condition, fatty liver, seasonal allergic rhinitis, and oral thrush. Tr. at 469. He stopped Actos, started Lantus 10 units, prescribed Diflucan, refilled Norco, and continued Plaintiff's other medications. Tr. at 469–70.

On January 31, 2018, Plaintiff reported inability to exercise, intolerance to Actos, and poor response to diabetes therapy. Tr. at 457. Dr. Henderson noted normal findings on exam. Tr. at 461. He instructed Plaintiff to titrate up his Lantus dose by two units every two days until his fasting glucose was consistently below 130 mg/dL. *Id.*

Plaintiff reported poor response to diabetes therapy and worsening bilateral lower back pain on March 30, 2018. Tr. at 447. Dr. Henderson noted normal findings on exam. Tr. at 452–53. Testing on March 28 showed Plaintiff's hemoglobin A1c to be elevated at 9.7%, Tr. at 449, but Dr. Henderson noted this measure reflected part of the time before he was on insulin. Tr. at 453. Dr. Henderson continued Lantus for diabetes and instructed Plaintiff to continue to titrate it by two units every two days until his fasting blood sugar level was consistently below 130 mg/dL. *Id.* He refilled Lisinopril and Norco and continued Plaintiff's other medications. Tr. at 453–54.

On July 2, 2018, Plaintiff reported symptoms consistent with mild depression. Tr. at 438. Dr. Henderson recorded normal findings on physical

exam. Tr. at 444. He continued Farxiga and Metformin and increased Lantus to 60 units once a day. *Id.* He refilled Norco, Trazodone, and Cymbalta and instructed Plaintiff to continue his other medications and to eat healthier foods. Tr. at 445.

Plaintiff complained of "[s]haking really bad" on August 21, 2018. Tr. at 432. He described having developed constant fine shaking in his arms and hands four weeks prior. *Id.* He also endorsed moderate daily headaches. *Id.* He was 71" tall and weighed 266 pounds. *Id.* Dr. Henderson observed a fine amplitude tremor in Plaintiff's arms and hands that was more pronounced with his arms outstretched than relaxed. Tr. at 436. He ordered lab studies and referred Plaintiff to a neurologist for evaluation of migraines and tremors. *Id.* He encouraged Plaintiff to exercise for a minimum of 30 minutes per day on five days a week and to eat more fruits, vegetables, lean protein, and whole grains. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on December 11, 2018, Plaintiff testified he lived in a house with his sister, her husband, and their children, ages 14 and 18. Tr. at 8. He denied providing care to anyone in the household. Tr. at 9. He said he was 5'11" tall, weighed 270 pounds, and was right-handed. Tr. at 9, 13. He

confirmed that his commercial driver's license remained valid. Tr. at 10. He said he had last renewed it in 2014, at which time he underwent a Department of Transportation physical. *Id.* He noted he continued to drive his personal vehicle and had driven himself to the hearing. Tr. at 13. He denied having served in the military or having any other professional or technical license or certification. Tr. at 11. He said he had not applied for or received unemployment benefits since his alleged onset date. Tr. at 11–12. He indicated he was receiving long-term disability benefits through his former employer. Tr. at 12. He said that he would receive the benefits through January 2020 based on his inability to perform his prior occupation. Tr. at 12–13. He denied having applied for or engaged in work since October 20, 2016. Tr. at 14, 21. He explained that additional pay he received during the fourth quarter of 2016 was for unused sick days and personal time. Tr. at 20–21.

Plaintiff testified he worked as a tractor trailer driver for AAA Cooper Transportation from 2010 until 2016. Tr. at 14–15. He said that in 2009 and 2010, he worked for CGM SC as a truck driver, dispatcher, and manager. Tr. at 15. He noted he was hired as a dispatcher and filled in as a driver when necessary. *Id.* He stated his supervisor ultimately concluded he was not capable of performing the dispatcher position and reassigned him to driving a truck. Tr. at 15–16. He described his job duty in the dispatcher role as

communicating assignments to drivers. Tr. at 16. He denied having hired, fired, and engaged in performance evaluations for other employees. *Id.* He said he ordered materials and supplies, dealt with customers, kept schedules, and prepared reports. Tr. at 16–17. He testified he worked for D&E Portside in 2007 and 2008, driving and serving as a dispatcher and manager at the same time. Tr. at 17. He said his job duties were comparable to those at CGM SC, except that he was driving all the time and performing his other duties from the truck. Tr. at 17–18. He stated he worked as a self-employed tractor trailer driver in 2008. Tr. at 18. He said he worked as an over-the-road truck driver for Averitt Express from 2003 to 2005. Tr. at 19.

Plaintiff testified that he had started using a cane eight to ten months prior. Tr. at 21. He explained that his left leg felt as if it were going out from underneath him when he started to walk. *Id.* He said he used the cane for support so that he would not fall. *Id.* He noted he could not bend over or stand up straight. Tr. at 21–22. He was uncertain why Dr. Henderson had not mentioned he was using a cane, despite having asked him about it during several visits. Tr. at 22. He admitted the cane had not been prescribed by a doctor. Tr. at 23. He said he used the cane outside of his home. *Id.* He denied requiring the cane to raise to a standing position, but felt he would need it if he attempted to stand for 20 minutes. Tr. at 35. He noted he wore a back brace at times, but said it did not help with his pain. Tr at 23, 35.

16

Plaintiff testified he visited Dr. Anderson on or around October 18, 2016, for lower back pain that he had initially noticed a couple of months prior. Tr. at 23–24. He stated the pain was making it more difficult for him to do his job. Tr. at 24. He said he could hardly move after driving two-and-a-half hours from Conway to Charleston. Tr. at 25. He stated he had difficulty moving after sitting for more than 20 minutes. *Id.* He described pain that radiated down both of his legs and into his toes, with the left being worse than the right. *Id.* He indicated his feet also felt numb, likely due to effects of diabetes. Tr. at 26. He noted he had pain in his legs and feet from both his back and diabetes. *Id.* He stated he first developed the diabetes-related pain in late-2016 or early-2017. Tr. at 27. He admitted his diabetes was generally controlled when he followed his doctor's advice and took his medication, but his neuropathy was not. Tr. at 27–28. He confirmed that Dr. Anderson had administered ESIs, but claimed they provided no prolonged relief. Tr. at 28–30.

Plaintiff testified he was unable to work because he could not stand for longer than 20 to 30 minutes without experiencing throbbing pain in his left leg and toes. Tr. at 30. He stated his knees locked up when he attempted to walk. *Id.* He said he had difficulty sitting for long periods of time and lifting a gallon of milk. *Id.* He noted he experienced excruciating pain that ranged

from a seven to a nine. *Id.* He said Norco took the edge off his pain, but did not take it away. Tr. at 31.

Plaintiff testified he would get up each morning, drink a cup of coffee, and smoke a cigarette prior to lying down for an hour or two because of pain in his legs and feet. Tr. at 31. He said he subsequently would get up, go to the bathroom, and take a shower. *Id.* He noted a shower had previously taken him 15 to 20 minutes, but more recently took him 30 to 45 minutes because he felt lightheaded. *Id.* He described sitting on the edge of the tub because his legs felt as if they were going to fall out from underneath him. *Id.* He said he would lie down again after showering because his back pain would increase. *Id.* He indicated he tried to help his sister to prepare dinner, but avoided heavy lifting. Tr. at 32. He said he spent all but an hour of the prior day lying down because the cold weather had exacerbated his back pain. Tr. at 34. He estimated he was typically spending six hours a day lying down when he stopped work in October 2016. *Id.*

Plaintiff admitted Dr. Anderson was initially reluctant to perform surgery. Tr. at 34. He said he would consider surgery if it were an option, but that he could not afford it. Tr. at 32. He noted he had stopped treating with Dr. Anderson in early 2017 because he did not like the physician assistant in his office. Tr. at 33. He also said he could not continue to see Dr. Anderson because he had no insurance. *Id.* He indicated he had sought low-cost and no-

cost insurance, but did not qualify because of his long-term disability benefits. Tr. at 33–34.

Plaintiff stated he had recently reported tremors to Dr. Henderson, who had prescribed anxiety medication that had not helped. Tr. at 36. He said Dr. Henderson planned to pursue further testing to determine if some abnormality in his brain was causing the tremors. *Id.*

Plaintiff testified he used a smartphone to "keep tabs on" his father and for social networking, including Facebook. Tr. at 42. He said he sometimes used a computer. *Id.* He noted he had worked as a truck driver for 26 years and had loved his job. Tr. at 43.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Lavonne Brent reviewed the record and testified at the hearing. Tr. at 43–56. The VE categorized Plaintiff's PRW as an over-the-road truck driver, *Dictionary of Occupational Titles* ("*DOT*") number 905.683-014, as requiring medium exertion with a specific vocational preparation ("SVP") of 4. Tr. at 45. She identified Plaintiff's other PRW as a composite job of tractor trailer driver, *DOT* number 904.683-010, as requiring medium exertion per the *DOT* and heavy exertion as described by Plaintiff with an SVP of four, and dispatcher, *DOT* number 184.167-118, as requiring light exertion with an SVP of 6. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the light

exertional level; frequently handle, reach overhead and in all other directions, finger, and feel; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, balance, kneel, and crouch; never crawl or work at unprotected heights; and would be off-task no more than could be accommodated by normal breaks. Tr. at 46. The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 47. The ALJ specifically asked if the individual could perform the dispatcher position. *Id.* The VE testified the individual could perform work as a dispatcher if the other component of the job were not involved. *Id.* She stated there were 2,063,580 dispatcher positions in the national economy. Tr. at 47–48. The ALJ asked whether there were any other jobs in the national economy the hypothetical person could perform. Tr. at 48. The VE identified light jobs with an SVP of 2 as an inspector, *DOT* number 529.687-058, a checker, *DOT* number 221.587-010, and a mounter, *DOT* number 208.685-022, with 434,150, 67,870, and 261,690 positions in the national economy, respectively. *Id.*

The ALJ next asked the VE to consider the individual described in the prior hypothetical question and to further assume that he would be limited to simple and routine tasks and simple work-related decisions regarding use of judgment and dealing with changes in the work setting, as well as occasional interaction with supervisors, coworkers, and the public. *Id.* The VE confirmed

the additional restriction would rule out the dispatcher position, but allow for performance of the other three positions. *Id.*

For a third hypothetical question, the ALJ asked the VE to consider the first hypothetical question and to further assume the individual would be limited to occasional bilateral reaching overhead and in all directions, handling, fingering, and feeling. Tr. at 49. The VE testified the restriction would preclude all work. *Id.*

As a fourth hypothetical question, the ALJ asked the VE to consider the restrictions in the first hypothetical, except the individual would be limited to sedentary work. *Id.* The VE confirmed Plaintiff had no prior sedentary work. *Id.* She further testified Plaintiff had acquired no skills in his PRW that would transfer to sedentary work. Tr. at 50. She identified work the hypothetical individual could perform to include jobs at the sedentary exertional level with an SVP of 2 as a stuffer, *DOT* number 731.685-014, a sorter, *DOT* number 521.687-086, and a paster, *DOT* number 249.587-014, with 354,810, 434,170, and 771,210 positions in the national economy, respectively. *Id.* The ALJ asked the VE if all the positions would be eliminated if he were to restrict the individual to occasional bilateral reaching overhead and in all other directions, handling, fingering, and feeling. Tr. at 50–51. The VE testified those positions and all other sedentary positions would be eliminated. Tr. at 51.

The ALJ asked the VE to consider the first hypothetical question, but to further consider the individual would be limited to sedentary work, simple and routine tasks, simple work-related decisions regarding use of judgment, occasionally dealing with change in the work setting, and occasionally interacting with supervisors, coworkers, and the public. *Id.* He asked if the individual would be able to perform the sedentary jobs the VE previously identified. *Id.* The VE confirmed he would. *Id.* The ALJ later asked the VE if an individual limited to light work with the mental restrictions identified above would be able to perform the jobs previously identified. Tr. at 53. She confirmed he would. *Id.*

The ALJ asked the VE to consider the jobs previously identified and added a sit/stand option, defined as a brief postural change at or near the workstation occurring no more frequently than twice an hour and of no duration greater than five minutes each. Tr. at 51–52. He asked if the individual would be able to perform work as a dispatcher. Tr. at 52. The VE testified he could. *Id.* The ALJ asked if the other three positions at the light exertional level would be available. *Id.* The VE confirmed they would. *Id.* The ALJ asked if the three positions at the sedentary exertional level would be available. *Id.* The VE testified they would remain available. *Id.*

The ALJ asked the VE to consider the individual would require a hand-held assistive device such as a cane for prolonged ambulation, ascending or

descending slopes, or traversing over uneven terrain. *Id.* He questioned the VE as to the availability of the jobs she previously identified. *Id.* The VE testified the individual would be able to perform all the jobs she previously identified at the sedentary and light exertional levels. *Id.*

The ALJ next asked the VE to consider the individual would be off-task for 15% or more of the working day. Tr. at 52–53. The VE testified the restriction would eliminate all work. Tr. at 53.

The ALJ asked the VE to assume the individual would be absent from work two or more days per month on a consistent basis. *Id.* The VE confirmed the restriction would eliminate all work. *Id.*

The VE confirmed her testimony had been consistent with the *DOT*, except that the *DOT* did not address sit/stand options, time off-task, absenteeism, use of an assistive device, the differentiation between overhead and directional reaching, and the differentiation between extremities. Tr. at 53–54.

The ALJ asked the VE if all work would be eliminated if an individual had marked loss of ability to perform one of the basic mental demands for unskilled work. Tr. at 54. The VE confirmed all work would be eliminated. *Id.*

As a final question, the ALJ asked the VE to consider the individual would be incapable of work at any exertional level on a consistent basis for eight hours a day and 40 hours a week. *Id.* He asked if the restriction would

render the individual unemployable. Tr. at 54–55. The VE confirmed it would. Tr. at 55.

The VE again confirmed her testimony was consistent with the *DOT* and considered her training, education, and work experience. *Id.*

Plaintiff's attorney asked the VE if the individual would be able to perform the jobs she previously identified if he were required to hold a cane for balancing and stability while standing in a stationary position. Tr. at 55–56. The VE testified the restriction would preclude work as a dispatcher and other light jobs. Tr. at 56. She stated the sedentary positions would remain available. *Id.*

### 2.     The ALJ's Findings

In his decision dated May 15, 2019, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.
2.     The claimant has not engaged in substantial gainful activity since October 21, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.     The claimant has the following severe impairments: degenerative disc disease (20 CFR 404.1520(c)).
4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: frequent bilateral reaching overhead and in all directions; frequent bilateral handling, fingering, feeling; occasional

climbing ramps and stairs, balance[ing], stooping, kneeling, and crouching; never climbing ladders, ropes, or scaffolds; never crawling; never working on unprotected heights; claimant requires a sit/stand option defined as a brief postural change at or near the work station, no more frequent than twice in an hour and a duration of no greater than 5 minutes each; and any time off task can be accommodated by normal breaks.

6.    The claimant is capable of performing past relevant work as a dispatcher. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from October 21, 2016, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 93–101.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to properly evaluate Dr. Anderson's opinion in assessing his RFC; and

2)    the ALJ erred in failing to consider any of his mental impairments as severe and in failing to include appropriate mental limitations.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly

25

apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4)

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE

---

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold

the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Consideration of Dr. Anderson's Opinion

On February 3, 2017, Dr. Anderson completed a physical impairment questionnaire. Tr. at 320–21. He described the nature of his contact with Plaintiff as monthly office visits since October 2016. Tr. at 320. He identified Plaintiff's diagnoses as low back pain, spondylosis, and radiculopathy. *Id.* He noted Plaintiff's symptoms included axial back and bilateral lower extremity pain. *Id.* He stated Plaintiff's symptoms were frequently severe enough to interfere with attention and concentration required to perform simple work-related tasks. *Id.* He denied Plaintiff's medication-related side effects would

affect his ability to work. *Id.* He indicated Plaintiff would need to recline or lie down during a hypothetical eight-hour workday in excess of the typical 15-minute morning and afternoon breaks and 30- to 60-minute lunch break. *Id.* He estimated Plaintiff could walk one block without rest or significant pain; sit for 30 minutes and stand/walk for five minutes at a time; sit for four hours in an eight-hour workday; and stand/walk for one hour in an eight-hour workday. *Id.* He denied that Plaintiff would require unscheduled breaks during an eight-hour workday. *Id.* He indicated Plaintiff could occasionally lift up to 25 pounds. Tr. at 321. He denied that Plaintiff had limitations in performing repetitive reaching, handling, or fingering. *Id.* He estimated Plaintiff would likely be absent from work once or twice a month because of his impairments. *Id.* He indicated Plaintiff was not a malingerer. *Id.* He noted Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations he described in his evaluation. *Id.* He did not consider Plaintiff physically capable of working an eight-hour day, five days a week on a sustained basis. *Id.* He indicated Plaintiff had been limited as he described since October 18, 2016. Tr. at 322.

Plaintiff argues the ALJ failed to properly evaluate Dr. Anderson's opinion, resulting in improper assessment of his RFC. [ECF No. 18 at 12]. He maintains the ALJ did not consider the appropriate regulatory factors in evaluating Dr. Anderson's opinion. *Id.* at 15. He notes Dr. Anderson was a

treating physician who examined him on multiple occasions and provided an opinion that was consistent with imaging findings, physical therapy evaluations, and Dr. Henderson's findings. *Id.* at 16–18. He claims he is not asking the court to reweigh the evidence, but is instead arguing that the ALJ provided a "cursory and conclusory analysis" that does not provide good reasons for rejecting the treating physician's opinion. [ECF No. 20 at 1–3].

The Commissioner argues that substantial evidence supports the ALJ's weighing of Dr. Anderson's opinion. [ECF No. 19 at 10]. He maintains the ALJ gave little weight to Dr. Anderson's opinion because it was generally inconsistent with the minimal clinical findings on physical examinations. *Id.* at 11–12. He maintains the ALJ considered the diagnostic findings, Plaintiff's report of improvement following ESIs, and Dr. Anderson's documentation of 5/5 strength, normal muscular tone and bulk, normal/non-antalgic gait and station, and normal coordination. *Id.* at 12. He contends Dr. Henderson's later treatment notes showed no back pain with ROM testing and normal musculoskeletal ROM; occasional denials of joint, muscle, or back pain; and advice to exercise at least 30 minutes per day on five days per week. *Id.* at 12–13. The Commissioner notes that Dr. Ferguson recorded Plaintiff's gait and station as normal. *Id.* at 13. He claims the ALJ properly gave partial weight to the state agency consultants' opinions. *Id.*

The ALJ must consider all the relevant evidence and account for all of the claimant's medically-determinable impairments in the RFC assessment. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). He must include a narrative discussion describing how all the relevant evidence supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations). SSR 96-8p, 1996 WL 374184 at *7. He must explain how he resolved any material inconsistencies in the record. SSR 16-3p, 2016 WL 1119029, at *7.

Medical opinions are among the evidence that must be considered in assessing a claimant's RFC. *See* 20 C.F.R. § 404.1527(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."). Because Plaintiff's application for benefits was filed prior to March 27, 2017, the ALJ was to evaluate the medical opinions based on the rules in 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, and 06-03p. *See* 20 C.F.R. § 404.1520c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 apply"); *see also* 82 Fed. Reg. 15,263 (stating the rescissions of SSRs 96-2p, 96-5p, and 06-03p were effective for "claims filed on or after March 27, 2017"). The treating physician rule dictates that an ALJ should accord controlling weight to a treating physician's opinion if it is well supported by medically-acceptable clinical and laboratory diagnostic techniques and is not

32

inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2). "[T]reating physicians are given 'more weight . . . since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone[.]'" *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).

However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 174 (4th Cir. 2011) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). If the ALJ declines to issue a fully favorable decision, his decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record" and must be "sufficiently specific to make clear" to the court "the weight [he] gave to the . . opinion and the reason for that weight." SSR 96-2p, 1996 WL 374188, *5 (1996).

An ALJ cannot simply reject a treating physician's opinion upon concluding it is not entitled to controlling weight. SSR 96-2p, 1996 WL 374188, at *4. He must evaluate and weigh the opinion based on the factors in 20 C.F.R. § 404.1527(c), which include "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician

and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527(c)).

The ALJ "must always give good reasons" for the weight he allocates to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). However, "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion," *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam), the court should not disturb the ALJ's weighing of the medical opinions of record.

The ALJ summarized Dr. Anderson's opinion and gave it little weight, explaining as follows:

> The undersigned notes that the evidence of record documents 4 treatment visits with Dr. Anderson from October 2016 through February 2017. Although Dr. Anderson's responses on this questionnaire are consistent with his recommendation that the claimant should stay out of work documented in treatment notes, his opinions are generally inconsistent with the minimal clinical findings on physical examinations by Dr. Anderson and other treatment providers throughout the relevant period.

Tr. at 97–98.

Thus, the ALJ declined to accord controlling weight to Dr. Anderson's opinion and gave it "little weight" instead, as he considered it to be unsupported by his physical examinations and inconsistent with other providers' physical examinations.

34

A review of the ALJ's decision shows that he considered the relevant factors in 20 C.F.R. § 404.1527 and adequately supported his decision to accord little weight to Dr. Anderson's opinion. Prior to having discussed Dr. Anderson's opinion, the ALJ summarized his examining and treatment history with Plaintiff in accordance with 20 C.F.R. § 404.1527(c)(1) and (2). Tr. at 97. In accordance with 20 C.F.R. § 404.1527(c)(5), he noted that Dr. Anderson was a "spine specialist" who first evaluated Plaintiff in October 2016 and saw him "on three more occasions through February 2017." *Id.* He wrote:

> The claimant was treated with injections and a back brace. Examinations consistently revealed 5/5 strength in the upper and lower extremities, normal muscular tone and bulk, and normal gait and station. Sensory exams were intact. A lumbar MRI revealed degenerated discs at L4–5 with L5–S1, with a small to moderately sided left paracentral herniation at L4–5 with deflection of his L5 root on the left. There was a central small herniation at L5–S1 between the nerve roots. The claimant stated that his low back pain was exacerbated by bending, twisting, lifting, or prolonged sitting. Treatment notes indicate that Dr. Anderson advised the claimant to stay out of work, rest, and avoid heavy or repetitive bending, lifting, and twisting. Dr. Anderson recommended conservative therapy, including weight loss and physical therapy, rather than surgery (Exhibit 3F).

*Id.* Thus, ALJ found that although Dr. Anderson's specialization weighed in favor of his opinion, the fact that he only examined Plaintiff on four occasions and noted benign findings during each of his exams did not. *See* Tr. at 97–98. The ALJ considered the length of the treatment relationship, the frequency of

examination, and the nature and extent of the treatment relationship in accordance with 20 C.F.R. § 404.1527(c)(2)(i) and (ii).

In discussing his allocation of little weight to Dr. Anderson's opinion, ALJ cursorily stated that it was inconsistent with the minimal clinical findings during other providers' examinations. However, a review of the entire decision shows the ALJ adequately considered the consistency of Dr. Anderson's opinion with the other evidence in accordance with 20 C.F.R. § 404.1527(c)(4). He noted Plaintiff had increased ROM of the lumbar spine, increased lower extremity strength, and decreased subjective pain reports on a physical therapy reevaluation in February 2017. Tr. at 98. He wrote "[t]he minimal clinical findings on examinations throughout the relevant period [were] inconsistent with the claimant's allegations of symptoms of disabling severity," and discussed records from Dr. Henderson from November 2016 through July 2018 that showed "generally unremarkable" examinations with "[n]o mental status abnormalities, strength deficits, or sensory deficits." *Id.*

Although imaging reports revealed significant impairment to Plaintiff's lumbar spine and some findings during physical therapy evaluations and other exams arguably supported Dr. Anderson's opinion, such evidence does not render the ALJ's weighing of the opinion invalid. The ALJ considered such evidence in his decision. Tr. at 97 (discussing an MRI of the lumbar spine), Tr. at 98 (noting Dr. Henderson "routinely prescribed Norco for

36

treatment of the claimant's chronic low back pain" and observed "decreased range of motion of the low back . . . on several visits"). However, he reasonably concluded that evidence was outweighed by the evidence cited above.

The ALJ considered and gave partial weight to the state agency consultants' opinions in assessing an RFC for light work with additional restrictions, as opposed to the RFC Dr. Anderson indicated in his opinion. *See* Tr. at 99. He explained that Plaintiff's DDD was "well documented by medical imaging and reasonably limits him to the performance of work activities at no more than the light exertional level." *Id.* He stated he gave Plaintiff "some benefit of the doubt in finding that he [was] limited to frequent reaching, handling, fingering, and feeling," noting he had testified "he could use his hands and arms, but not constantly." *Id.* He stated "[t]he combined effect of" DDD and Plaintiff's non-severe impairments "reasonably support[ed] the need for the postural limitations, environmental limitations, and sit/stand option" he included in the RFC assessment. *Id.* However, he concluded use of a cane was not medically necessary, as "examinations consistently revealed normal gait, normal strength and muscle tone, and no sensory deficits." *Id.*

The ALJ weighed Dr. Anderson's opinion based on the relevant factors in 20 C.F.R. § 404.1527(c), did not "dredge[] up 'specious inconsistencies,'"

and gave good reasons for the weight he allocated to it. He cited the evidence, resolved inconsistencies, and provided an adequate explanation for the RFC he assessed. Therefore, the undersigned finds substantial evidence supports the ALJ's allocation of little weight to Dr. Anderson's opinion and his assessment of an RFC for light work with additional restrictions.

2.    Mental Limitations

Plaintiff argues the ALJ erred in failing to assess a severe mental impairment, despite his use of multiple mental health medications and Dr. Henderson's assessment of marked and moderate mental limitations. [ECF No. 18 at 18–21]. He maintains the ALJ failed to include provisions in the RFC assessment to address evidence of significant, ongoing, and worsening depression and anxiety and more frequent panic attacks for which he received significant medication. [ECF No. 20 at 3].

The Commissioner argues substantial evidence supports the ALJ's evaluation of Plaintiff's mental impairments as non-severe at step two. [ECF No. 19 at 13]. He maintains the ALJ considered the four broad areas of mental functioning in concluding Plaintiff's mental impairments were non-severe. *Id.* at 14. He contends Plaintiff's impressions in the Adult Function Report, his reports to his medical providers, and the medical providers' impressions supported the ALJ's conclusion that Plaintiff's mental impairments were non-severe. *Id.* He maintains the ALJ properly gave little

weight to Dr. Henderson's opinion that Plaintiff had moderate-to-marked mental limitations because the opinion was inconsistent with observations in his treatment notes. *Id.* at 15–16. He claims the ALJ properly credited the state agency psychologist's opinions that Plaintiff had only mild limitations and that his depression was non-severe. *Id.* at 16. He notes the ALJ also rejected Plaintiff's claim that he could not afford treatment as inconsistent with his receipt of long-term disability benefits. *Id.* at 18.

A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at [step two] when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, and work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities[3])." SSR 85-28.

---

[3] "[B]asic work activities are the abilities and aptitudes necessary to do most jobs." SSR 85-28. Examples include: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." SSR 85-28.

ALJs are required to use the special technique in 20 C.F.R. § 404.1520a to evaluate the severity of alleged mental impairments. After determining a claimant has a medically-determinable mental impairment, the ALJ must rate the degree of the claimant's functional limitation as none, mild, moderate, marked, or extreme based on "the extent to which [his] impairment(s) interfere with [his] ability to function independently, appropriately, effectively, and on a sustained basis" in the broad functional areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. 20 C.F.R. § 404.1520a(b), (c)(2), (3), (4). If the ALJ rates the degree of the claimant's limitations as "none" or "mild," he will generally conclude the impairment is non-severe, unless the evidence otherwise indicates there is more than a minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). If the ALJ rates the degree of Plaintiff's limitations as moderate, marked, or extreme, he should conclude the impairment is severe and assess whether it meets or equals a listing. 20 C.F.R. § 404.1520a(d)(2). If the claimant's impairment is severe, but does not meet or equal a listing, the ALJ should consider it in assessing the RFC. 20 C.F.R. § 404.1520a(d)(3).

Because an ALJ's recognition of a single impairment at step two ensures that he will proceed to subsequent steps, this court has found no

reversible error in ALJs' erroneous assessments of impairments as non-severe, provided the impairments were considered at subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, C/A No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009). However, the ALJ is required to show in his decision "the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." 20 C.F.R. § 404.1520a(e)(4). His "decision must include a specific finding as to the degree of limitation in each of the functional areas." *Id.*

> The ALJ addressed Plaintiff's mental impairments as follows:

> The claimant's medically determinable impairment of depression does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere.

> In making this finding, the undersigned has considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four areas of mental functioning are known as the "paragraph B" criteria.

> In understanding, remembering, or applying information, the claimant has no limitations. The claimant stated that he could perform simple household chores and prepare meals within the constraints of his physical condition, go to doctor's appointments, take medications, and drive. In addition, the record shows that the claimant was able to provide information about his health, describe his prior work history, follow instructions from healthcare providers, comply with treatment outside of a doctor's

41

office or hospital, and respond to questions from medical providers.

In interacting with others, the claimant has mild limitations. Here, the claimant alleged that he has difficulty engaging in social activities. However, according to his statements, the claimant is able to spend time with friends and family and live with others. Finally, the medical evidence shows that the claimant had a good rapport with providers, was described as pleasant and cooperative, had good interactions with non-medical staff, and appeared comfortable during appointments.

The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace. For this criterion, the claimant has mild limitations. The claimant contended that he had limitations in maintaining a regular work schedule. On the other hand, the claimant said that he is able to drive, prepare meals, and handle his own medical care.

Finally, the claimant has no limitations in his ability to adapt or manage himself. The claimant did not allege any symptoms or limitations that relate to this criterion. Furthermore, the claimant stated he is able to handle self-care and personal hygiene. Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene, no problem getting along well with providers and staff, normal mood and affect, and no problems with temper control.

Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the functional areas, it is nonsevere (20 CFR 404.1520a(d)(1)).

Tr. at 94–95. Thus, the ALJ applied the special technique in 20 C.F.R. §

404.1520a, specifying the evidence he considered in reaching his conclusion

as to the severity of Plaintiff's mental impairments and setting forth specific

findings as to the degree of limitation in each of the functional areas.

In evaluating the severity of Plaintiff's mental impairments, the ALJ gave great weight to the state agency psychological consultants' opinions that Plaintiff had mild limitations in his abilities to interact with others and concentrate, persist, or maintain pace; no limitations in the other broad functional areas of mental functioning; and that his depression was non-severe. Tr. at 95.

Plaintiff cites the restrictions Dr. Henderson included in his opinion as suggesting his mental impairments were severe and his RFC was more restricted than the ALJ recognized. [ECF No. 18 at 19–22]. Although he notes his subjective reports, he fails to cite any objective evidence to support the degree of functional limitations Dr. Henderson suggested. *See id.*

The ALJ addressed Dr. Henderson's opinion as to Plaintiff's mental abilities as follows:

> In March 2017, Frampton Henderson, M.D., the claimant's primary care provider, completed a mental capacity assessment, indicating that the claimant had marked to moderate limitations in his ability to perform many work-related mental activities. However, this opinion is inconsistent with Dr. Henderson's prior and contemporaneous treatment notes, which reflect no objective clinical findings of mental abnormalities (Exhibits 4F and 5F). Although he is the claimant's treating physician, the record shows that Dr. Henderson had seen the claimant only twice before completing the questionnaire. Mental status examinations documented in the treatment record were unremarkable. It appears that this opinion was based solely on the claimant's subjective allegations. It is also inconsistent with the routine and conservative nature of the claimant's mental health treatment, which is provided by his primary care provider. Prescribed medications appear to control his mental symptoms adequately.

43

> There is no indication that the claimant was ever referred to a psychiatrist or psychotherapist. The undersigned therefore gives little weight to this opinion.

Tr. at 95. Thus, the ALJ considered Dr. Henderson's opinion in evaluating the severity of Plaintiff's mental impairments, but concluded the opinion was not supported by his treatment notes and inconsistent with the type of treatment Plaintiff received.

The ALJ declined to include any mental restrictions in the RFC assessment. *See* Tr. at 96. He noted Dr. Henderson provided "routine refills for medications the claimant took for . . . depression/panic disorder." Tr. at 98. He indicated "[n]o mental status abnormalities . . . were documented." *Id.*

A review of the record as a whole supports the ALJ's allocation of little weight to Dr. Henderson's opinion and his assessment of non-severe mental impairments. It further supports his impression of Plaintiff's treatment history with Dr. Henderson.

Progress notes from Plaintiff's visits with Dr. Henderson provide an inconsistent picture as to his complaints regarding the severity of his mental impairments. Upon presentation to Dr. Henderson on November 28, 2016, Plaintiff's mood was at his "baseline" and his anxiety was "doing well and without complaints." Tr. at 342. He denied suicidal ideation, depression, and anxiety. Tr. at 342, 343. On March 31, 2017, a depression screen was negative, but Plaintiff complained of worsening anxiety and panic attacks

occurring more frequently. Tr. at 337. Records from Plaintiff's June 30, 2017 visit with Dr. Henderson indicate "depression is doing ok but anxiety and panic attacks are getting worse" and "more frequent panic attacks." Tr. at 487. However, they also note "[a]nxiety follow-up doing well and without complaints" and "[d]enies depression, anxiety." Tr. at 487, 488. Records from Plaintiff's visit with Dr. Henderson on September 29, 2017, indicate "depression and anxiety getting worse," "more frequent panic attacks," and "pt has been irritable lately," but "[a]nxiety follow-up doing well and without complaints" and "[d]enies depression, anxiety." Tr. at 472, 473. A progress note from Plaintiff's January 2, 2018 visit with Dr. Henderson states "depression and anxiety getting worse" and "more frequent panic attacks," but "[a]nxiety follow-up doing well and without complaints" and "[d]enies depression, anxiety." Tr. at 463, 464. Plaintiff "denie[d] depression and anxiety" on January 31, 2018. Tr. at 459. On March 30, 2018, progress notes reflect "depression and anxiety getting worse" and "more frequent panic attacks," but also provide "[a]nxiety follow-up doing well and without complaints and "[d]enies depression, anxiety." Tr. at 448, 449. On July 2, 2018, Plaintiff's responses to a depression screening were consistent with mild depression. Tr. at 438. He indicated "depression and anxiety [were] getting worse" and panic attacks were "more frequent," but the notes

inconsistently state "[a]nxiety follow-up doing well and without complaints" and "[d]enies depression, anxiety." Tr. at 439, 440.

Although treatment records contain some reports as to increased and worsened anxiety, depression, and panic attacks and show two adjustments to Plaintiff's medications, Tr. at 340–41 (increasing Celexa from 20 to 40 mg on March 31, 2017) and Tr. at 478 (stopping Celexa and prescribing Cymbalta 30 mg twice a day), they generally reflect the lack of mental status abnormalities the ALJ cited. Progress notes for all visits show unchanged stressors, normal concentration and energy, and no anhedonia, change in appetite, hallucinations, racing thoughts, paranoia, sleep disturbance, suicidal ideations, or weight change. Tr. at 337, 439, 448, 463, 472, 487. They reflect Plaintiff was not engaging in counseling or seeing a psychiatrist. *See id.* Every visit also includes Dr. Henderson's observations of "normal mood and affect" on psychiatric exam. Tr. at 340, 344, 436, 444, 453, 461, 469, 477, 491. Dr. Henderson continued Plaintiff's medications at the same dosages during most visits, suggesting stable symptoms. Tr. at 445, 454, 469, 491, 492.

As the ALJ evaluated Plaintiff's mental impairments in accordance with the applicable regulations and the record supports his explanations and conclusions, the court finds that substantial evidence supports his

46

assessment of non-severe mental impairments and his decision not to include mental restrictions in the RFC assessment.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

January 7, 2021                                     Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge